**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **ANGELIQUE RUSSELL,** | ) | **Case No. _______________** |
| **Plaintiff,** | ) | **JURY DEMANDED** |
| **v.** | ) | |
| **HCA HEALTHCARE, INC.,** | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

Plaintiff Angelique Russell ("Plaintiff" or "Russell") alleges the following claims against Defendant HCA Healthcare, Inc. ("Defendant" or "HCA"):

**NATURE OF THE CASE**

1. This is a retaliatory discharge action brought by Russell against HCA under the Tennessee Public Protection Act. Russell, a Manager of Data Science in HCA's Digital Technology and Innovation department, was terminated on April 3, 2026, after she identified and reported that HCA's AI-enabled nurse staffing and census forecasting system could neither be audited nor reproduced, in violation of federal regulations that protect patient health and safety.

2. Russell determined that Timpani, an AI system whose daily census predictions help set nurse staffing levels across HCA's hospitals, overwrote the data used to generate its predictions on a rolling basis, leaving HCA permanently unable to reproduce or audit the staffing decisions the system drove. HCA's own personnel confirmed that this design was intentional and that audit snapshots had been discontinued to save cost.

3. Russell documented these defects, conducted a root cause analysis, and escalated her findings to HCA's Director of Responsible AI and to HCA's Compliance department. HCA placed her on a performance improvement plan and then terminated her employment.

4. HCA's stated performance reasons for Russell's separation were pretextual. The product-team partners who worked directly with Russell consistently approved her technical work.

5. Russell brings this action under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 and the common law, seeking back pay, front pay, compensatory damages, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, and other equitable relief.

## PARTIES

6. Plaintiff Angelique Russell is an individual and a citizen of the State of Minnesota, where she resided and performed her work for HCA on a remote basis at all times relevant to this Complaint.

7. Defendant HCA Healthcare, Inc. is a Delaware corporation with its principal place of business at One Park Plaza, Nashville, Tennessee 37203. HCA is authorized to do business in Tennessee, and its registered agent for service of process is C T Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919. HCA is an employer within the meaning of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs,

and is between citizens of different States. Plaintiff is a citizen of Minnesota, and Defendant is a citizen of Delaware and Tennessee.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is headquartered in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

10. This Court has personal jurisdiction over Defendant because its principal place of business is located in this District.

## FACTS

### A. Russell's Employment with HCA

11. HCA employed Russell as a Manager, Data Science within its Digital Technology and Innovation ("DT&I") department, in the DT&I AI group. Russell performed her work for HCA remotely from Minnesota.

12. Russell's annualized base salary was approximately $203,000.

13. Beginning in approximately December 2025, Russell served as tech lead of the "OR Pod," a team developing HCA's Scheduling Duration Accuracy ("SDA") algorithm, an AI model used to predict surgical procedure durations for operating-room scheduling across HCA's hospital network. The OR Pod's product owner and domain leader approved Russell's technical roadmap.

### B. Russell's Reports Concerning the SDA Model

14. In mid-January 2026, Russell identified a series of technical defects in the SDA model code, including data leakage caused by training the model on global means that incorporated the validation and holdout groups, and methodological errors in the look-back feature computation.

15. On January 27, 2026, Russell delivered a formal Issues Log to the OR Pod product team documenting these defects and the corresponding remediation steps. Two independent data-science consultants confirmed the validity of her findings.

16. HCA responded by telling Russell she was "creating swirl" by reporting code issues to the product team. Shortly after she delivered the Issues Log, HCA removed Russell from the tech-lead role and reassigned her to the Timpani team.

**C. The Timpani System and Its Role in Patient Care**

17. Timpani is an AI-enabled staffing and census forecasting system developed by HCA in collaboration with Palantir. Nurse staffing levels at HCA hospitals are determined in part by Timpani's daily census predictions, which forecast how many patients each unit will need to care for.

18. Nurse staffing levels bear directly on patient safety. Adequate nurse staffing is a recognized determinant of safe patient care, and insufficient staffing relative to patient census is associated with missed and delayed care, medication errors, and increased risk of patient harm. Because Timpani's census predictions help set the number of nurses scheduled, an inaccurate prediction can cause a unit to be staffed with too few nurses for the patients actually present.

19. In mid-February 2026, Russell raised concerns with Director Brooke Hamilton and Tech Lead Darwin Fu that Timpani lacked basic audit and reproducibility capabilities.

20. The feature inputs used to generate each day's staffing and census predictions were overwritten on a rolling basis and became permanently unavailable once Google BigQuery's Time Machine retention window expired. As a result, HCA could not reproduce any of Timpani's historical predictions or determine, after the fact, what census inputs had actually driven its

staffing recommendations on any given day. HCA therefore could not audit, validate, or verify the accuracy of the staffing decisions the system produced.

21. HCA's own personnel confirmed these defects. Jeff Mendenhall, the Timpani lead data scientist, acknowledged that the system's failure to retain historical feature data was intentional during development. Director Hamilton acknowledged that snapshot copies of the relevant tables had previously been maintained for audit purposes but were later discontinued due to cost.

**D. The Florida Citrus Hospital Failure and Its Patient-Safety Consequences**

22. Russell was assigned to investigate a live Timpani failure at HCA Florida Citrus Hospital, where retroactive manual corrections to census data modified prior feature values and caused cascading inaccurate census under-predictions that impaired a nurse manager's ability to complete staffing schedules.

23. Because Timpani under-predicted the census, the affected unit was at risk of being scheduled with fewer nurses than the patient population required, the type of understaffing that can compromise safe staffing levels and patient care. And because Timpani overwrote the historical feature data, HCA could not detect, trace, communicate, or correct such failures after the fact, meaning that similar staffing errors could recur and persist undetected across HCA's hospital network.

24. Russell's root cause analysis confirmed the systemic nature of the problem: Timpani overwrote historical feature data, making past predictions permanently non-reproducible, and the system provided no mechanism for detecting, communicating, or correcting such failures. Russell prepared a corrected architectural approach that preserved historical predictions and feature inputs over time in a reproducible and auditable manner.

**E. The Regulatory and Policy Violations Russell Identified**

25. Russell understood that Timpani's defects implicated federal regulations intended to protect patient health and safety, and HCA's own governance policy. Timpani is an AI system that uses and processes electronic protected health information ("ePHI") and helps set nurse staffing levels at HCA hospitals.

26. The HIPAA Security Rule requires covered entities to implement audit controls that record and examine activity in information systems that contain or use ePHI, 45 C.F.R. § 164.312(b), and to protect ePHI against improper alteration or destruction, 45 C.F.R. § 164.312(c)(1). By overwriting and destroying the feature data used to generate its clinical staffing predictions on a rolling basis, Timpani left HCA unable to record, examine, or reconstruct those decisions, contrary to these requirements.

27. Hospitals participating in the Medicare and Medicaid programs must comply with the CMS Conditions of Participation, 42 C.F.R. Part 482, which require, among other things, a data-driven quality assessment and performance improvement program and nursing services sufficient to provide adequate, safe patient care. A staffing tool whose predictions cannot be audited, reproduced, or meaningfully reviewed undermines HCA's ability to measure, monitor, and improve the safety of its staffing decisions and creates corresponding risk to HCA's continued program participation.

28. Joint Commission accreditation functions as CMS "deemed status" under Section 1865 of the Social Security Act and requires documented measurement, review, and accountability for staffing and patient-flow safety processes. An AI tool used to determine nurse staffing levels that cannot be audited, reproduced, or meaningfully reviewed creates direct accreditation risk and corresponding risk to HCA's deemed compliance.

29. Tennessee has likewise declared, by statute, that it is the policy of the State to encourage the improvement of patient safety, the quality of patient care, and the evaluation of the quality, safety, cost, processes, and necessity of healthcare services by hospitals, healthcare facilities, and healthcare providers. Tenn. Code Ann. § 68-11-272(a). Timpani's design was contrary to that policy. Because the system overwrote the feature data used to generate its clinical staffing predictions on a rolling basis, HCA could not evaluate, audit, or verify the quality and safety of the staffing decisions Timpani produced, and Russell's reports sought to restore the auditability and reproducibility that meaningful evaluation of patient-care quality and safety requires.

30. Timpani's defects also violated HCA's own Responsible AI Policy, EC.031, effective October 1, 2024. That policy states that responsible AI includes "accountability, and operation in a safe and secure manner that strives to protect individuals from physical, emotional, environmental, and/or digital harm," and it requires that AI solutions be subject to periodic audit for the duration of their lifespan, that key assumptions and decisions be documented with appropriate version control, and that solution performance be subject to accountable and consistent monitoring. By design, Timpani overwrote the very data needed to audit, reproduce, and monitor its clinical predictions, contrary to each of these requirements.

31. HCA's Responsible AI Policy further required colleagues to "[p]romptly notify the Director of Responsible AI" upon observing anomalies, a decline or material deviation in the accuracy of an AI system's outputs, or outputs that diverge from expectations. Russell's reports of Timpani's inaccurate predictions and unauditable design were precisely the disclosures the policy required her to make.

## F. HCA Places Russell on a Pretextual PIP and Terminates Her

32. On March 5, 2026, weeks after Russell first raised Timpani's auditability defects to Hamilton and Fu, HCA placed Russell on a Performance Improvement Plan ("PIP").

33. The performance deficiencies cited in the PIP were pretextual. The product-team partners who worked directly with Russell had consistently approved her deliverables.

34. On March 27, 2026, Russell formally reported her concerns about Timpani's auditability deficiencies and their regulatory and patient-safety implications to HCA's Director of Responsible AI within DT&I and to HCA's Compliance department. Russell was permitted to present her findings to AVP Sara Liao-Troth.

35. On April 3, 2026, days after Russell escalated her concerns to HCA's Compliance department, HCA terminated her employment.

**COUNT I**

**RETALIATORY DISCHARGE IN VIOLATION OF THE**

**TENNESSEE PUBLIC PROTECTION ACT, Tenn. Code Ann. § 50-1-304**

***(Plead in the Alternative)***

36. Plaintiff realleges and incorporates by reference Paragraphs 1 through 35 as if fully stated herein.

37. The Tennessee Public Protection Act prohibits an employer from discharging an employee solely for refusing to remain silent about illegal activities. "Illegal activities" means activities that are in violation of the criminal or civil code of Tennessee or the United States, or any regulation intended to protect the public health, safety, or welfare. Tenn. Code Ann. § 50-1-304(a)(3).

38. Russell was an employee of HCA.

39. Russell refused to remain silent about HCA's illegal activities. She reported, in writing and to HCA's Compliance department, that Timpani—an AI system that helps determine nurse staffing levels at HCA hospitals using electronic protected health information—could not be audited or reproduced, contrary to the HIPAA Security Rule's audit-control and integrity requirements, 45 C.F.R. § 164.312, the Medicare and Medicaid Conditions of Participation, 42 C.F.R. Part 482, and the Joint Commission accreditation standards that protect patient health and safety, and contrary to the public policy Tennessee has declared in favor of the improvement and evaluation of patient safety and the quality of patient care, Tenn. Code Ann. § 68-11-272. These reports were also the disclosures HCA's own Responsible AI Policy required Russell to make.

40. These are activities in violation of regulations intended to protect the public health, safety, and welfare within the meaning of Tenn. Code Ann. § 50-1-304(a)(3).

41. HCA discharged Russell on April 3, 2026.

42. Russell's refusal to remain silent about HCA's illegal activities was the sole reason for her discharge. HCA's stated performance reasons were pretextual, as demonstrated by the consistent approval of Russell's work by the product-team partners who worked directly with her.

43. As a direct and proximate result of HCA's violation of the Tennessee Public Protection Act, Russell has suffered and continues to suffer lost wages and benefits, emotional distress, and other damages, and is entitled to back pay, front pay, compensatory damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, and other equitable relief, all in an amount to be proven at trial. Tenn. Code Ann. § 50-1-304(d).

## COUNT II
## COMMON-LAW RETALIATORY DISCHARGE
***(Plead in the Alternative)***

44. Plaintiff realleges and incorporates by reference Paragraphs 1 through 43 as if fully stated herein.

45. Tennessee common law prohibits an employer from discharging an employee in retaliation for the employee's exercise of a statutory or constitutional right, or for any reason that violates a clear public policy evidenced by an unambiguous statutory or regulatory provision.

46. Russell was an at-will employee of HCA.

47. Russell engaged in conduct protected by a clear public policy when she reported, and refused to remain silent about, HCA's operation of an unauditable and non-reproducible AI system used to set nurse staffing levels at hospitals using electronic protected health information, contrary to the HIPAA Security Rule, 45 C.F.R. § 164.312, the Medicare and Medicaid Conditions of Participation, 42 C.F.R. Part 482, and the Joint Commission accreditation standards that protect patient health and safety, and to the public policy Tennessee has declared in favor of the improvement and evaluation of patient safety and the quality of patient care, Tenn. Code Ann. § 68-11-272. Russell's reports were also the disclosures HCA's own Responsible AI Policy required her to make. Tennessee's clear public policy favors patient safety and the integrity of medical and healthcare operations.

48. HCA discharged Russell on April 3, 2026.

49. Russell's protected conduct was a substantial factor in HCA's decision to discharge her. HCA's stated performance reasons were pretextual.

50. As a direct and proximate result of HCA's retaliatory discharge, Russell has suffered and continues to suffer lost wages and benefits, emotional distress, and other damages, and is entitled to back pay, front pay, compensatory damages, and other relief in an amount to be proven at trial.

51. HCA's retaliatory discharge of Russell was intentional, malicious, fraudulent, or reckless, and therefore Russell is entitled to punitive damages.

**COUNT III**
**PROMISSORY ESTOPPEL**
***(Plead in the Alternative)***

52. Plaintiff realleges and incorporates by reference Paragraphs 1 through 51 as if fully stated herein.

53. Through its Responsible AI Policy, EC.031, HCA made unambiguous promises to its colleagues concerning the governance of its artificial-intelligence systems. HCA promised that its AI solutions would be subject to periodic audit for the duration of their lifespan, that key assumptions and decisions would be documented with appropriate version control, and that solution performance would be subject to accountable and consistent monitoring. HCA further promised, and directed, that colleagues would promptly notify the Director of Responsible AI upon observing anomalies, a decline or material deviation in the accuracy of an AI system's outputs, or outputs that diverge from expectations.

54. HCA should reasonably have expected these promises to induce action or forbearance on the part of its colleagues, including Russell. By adopting and publishing the Responsible AI Policy and requiring colleagues to act in conformity with it, HCA intended and expected that its colleagues would rely on the policy—including by investigating, documenting, and reporting

anomalies and deviations in the accuracy of HCA's AI systems to the Director of Responsible AI, rather than remaining silent.

55. Russell reasonably relied on HCA's promises to her detriment. In reliance on the Responsible AI Policy, Russell did precisely what the policy required of her: she investigated Timpani's auditability and accuracy defects, conducted a root cause analysis, documented her findings, and escalated them to HCA's Director of Responsible AI and to HCA's Compliance department. Rather than the audit, monitoring, and good-faith response the policy promised, HCA placed Russell on a pretextual Performance Improvement Plan and terminated her employment.

56. Injustice can be avoided only by enforcement of HCA's promises. As a direct and proximate result of her reasonable reliance on HCA's Responsible AI Policy, Russell has suffered and continues to suffer lost wages and benefits, emotional distress, and other damages, and is entitled to damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff prays for the following relief:

a. A jury to try her claims.

b. Entry of judgment in favor of Plaintiff, and against Defendant, for compensatory damages, including back pay and front pay, in an amount to be proven at trial.

c. Entry of judgment in favor of Plaintiff, and against Defendant, for punitive damages.

d. Reinstatement or, in lieu thereof, an award of front pay and other equitable relief.

e. An award of Plaintiff's reasonable attorneys' fees, costs, and expenses pursuant to Tenn. Code Ann. § 50-1-304(d).

f. Pre-judgment and post-judgment interest.

g. Any other legal or equitable relief to which Plaintiff may be entitled.

This 15th day of July 2026.

Respectfully submitted,

/s/ Ben H. Bodzy
Ben H. Bodzy (TN BPR No. 23517)
BODZY LAW PLLC
10 Burton Hills Boulevard, Suite 400
Nashville, TN 37215
(888) 215-6060 (phone)
bbodzy@bodzylaw.com

*Counsel for Plaintiff*